IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHAMONT SAPP,                                          CV 08-68-PK

                                                      OPINION AND
                                                      ORDER

                        Plaintiff,

v.


THE ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN
OREGON,



                        Defendant.
_____

PAPAK, Magistrate Judge:

> This action was filed against defendant The Roman Catholic Archbishop of Portland in

Oregon (the "Archbishop") by plaintiff *pro se* Shamont Sapp on January 11, 2008.  Sapp appears

to allege the Archbishop's vicarious liability for sexual battery and/or intentional infliction of

emotional distress on a theory of *respondeat superior*, and further to allege the Archbishop's

Page 1 - OPINION AND ORDER

direct liability for negligence.  This court has jurisdiction over Sapp's action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case arising under Title 11 of the United States Code.[1]

Now before the court is the Archbishop's motion to dismiss for failure to state a claim upon which relief can be granted or, in the alternative, to dismiss for insufficient service of process (#7).  This court has considered the Archbishop's motion and all of the pleadings on file. For the reasons set forth below, the motion to dismiss is denied to the extent premised on insufficient service of process, and granted to the extent premised on failure to state a claim. However, because he is proceeding *pro se*, Sapp shall have a period of sixty days within which he may file an amended complaint to cure the deficiencies set forth below, if he believes that the identified deficiencies may be so cured.  In the event that no amended complaint is filed, a final judgment will be entered at the end of the sixty day period.

## LEGAL STANDARDS

### I.      Motion to Dismiss for Insufficient Service of Process

The validity of the method or manner of service of process may be challenged by motion brought under Federal Civil Procedure Rule 12(b)(5).  *See* Fed. R. Civ. P. 12(b)(5).  A defendant does not fall within the personal jurisdiction of the federal courts unless the defendant has been properly served under Federal Civil Procedure Rule 4.  *See Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc.*, 840 F.2d 685, 688 (9th Cir. 1988).

---

[1]  Specifically, this action is subject to the future claims fund under the Third Amended and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to pay all claims made against the Archdiocese through 2023.

Once a defendant has challenged the sufficiency of process under Rule 12(b)(5), the plaintiff bears the burden of establishing its sufficiency. *See Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004). Objections to the sufficiency of service of process "must be specific and must point out in what manner the plaintiff has failed to satisfy the service provision utilized." *O'Brien v. R.J. O'Brien & Assoc.*, 998 F.2d 1394, 1400 (7th Cir. 1993), *citing Photolab Corp. v. Simplex Specialty Co.*, 806 F.2d 807, 810 (8th Cir. 1986).

In analyzing a Rule 12(b)(5) motion, "the provisions of Rule 4 should be given a liberal and flexible construction." *Borzeka v. Heckler*, 739 F.2d 444, 447 (9th Cir. 1984), *citing United Food & Commercial Workers Union Local 197 v. Alpha Beta Food Co.*, 736 F.2d 1371 (9th Cir. 1984). The courts have "broad" discretion either to dismiss an action without prejudice or simply to quash service and direct plaintiffs to effect service within a specified period of time, in the event service is determined to have been insufficient. *Oyama v. Sheehan (In re Sheehan)*, 253 F.3d 507, 513 (9th Cir. 2001); *see also* Fed. R. Civ. P. 4(m). The Ninth Circuit has expressly avoided articulating any specific test that must be applied in exercising that discretion. *See Sheehan*, 253 F.3d at 513.

*Pro se* litigants are "not excused from knowing the most basic pleading requirements." *American Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1108 (9th Cir. 2000), *citing Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 382 (9th Cir. 1997).

## II.     Motion to Dismiss for Failure to State a Claim

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative

level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. ---, 127 S.Ct. 1955, 1964-1965 (2007). "The

pleading must contain something more . . . than . . . a statement of facts that merely creates a

suspicion [of] a legally cognizable right of action." *Id.* at 1965, *quoting* 5 C. Wright & A. Miller,

Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a).

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations

contained in the pleadings, exhibits attached to the complaint, and matters properly subject to

judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a

motion to dismiss, this court accepts all of the allegations in the complaint as true and construes

them in the light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th

Cir. 2007). Moreover, the court "presume[s] that general allegations embrace those specific facts

that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256

(1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not,

however, accept legal conclusions "cast in the form of factual allegations." *Western Mining

Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

*Pro se* pleadings are held to a less stringent standard than those drafted by lawyers. *See

Haines v. Kerner*, 404 U.S. 519, 520 (1972). Specifically, a *pro se* litigant is entitled to notice of

the deficiencies in the complaint and an opportunity to amend, unless the complaint's

deficiencies cannot be cured by amendment. *See Flowers v. First Hawaiian Bank*, 295 F.3d 966,

976 (9th Cir. 2002), *citing Lucas v. Dep't of Corr.*, 66 F.3d 245, 248-49 (9th Cir. 1995), *Cook,

Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

Moreover, in civil rights cases involving a plaintiff proceeding *pro se*, this court construes the

pleadings liberally and affords the plaintiff the benefit of any doubt. *See Karim-Panahi v. Los*

*Angeles Police Dept.,* 839 F.2d 621, 623 (9th Cir. 1988).

## FACTUAL BACKGROUND

A runaway at age fifteen, in August 1979 plaintiff Sapp found himself in Portland, Oregon, lacking the means with which to purchase a bus ticket home. Sapp apparently decided to seek financial assistance at a Roman Catholic church, and may have been on his way to All Saints Parish in order to try his luck there when he was "approached" on "the street" by Father T. L., a priest of that parish, in his car. Fr. T. L. offered Sapp an opportunity to earn money by cutting grass at All Saints, and Sapp accepted the offer. Sapp therefore entered the priest's car.

After Sapp entered the car, Fr. T. L. fondled him sexually and spoke about performing oral sex on him. Apparently Fr. T. L. then drove Sapp onto All Saints premises and there performed oral sex on him. Afterwards, Fr. T. L. "coerced" Sapp into accepting a room at a motel for which Fr. T. L. paid the rates for five days, during which time he paid nightly visits for the purpose of giving and receiving oral sex. Subsequently, Fr. T. L. paid Sapp's bus fare home. Sapp's complaint is silent as to whether Sapp ever performed any grounds maintenance at All Saints, or ever entered All Saints' grounds other than within the confines of Fr. T. L.'s car.

Sapp alleges that he repressed the incident from memory until June 2006. Sapp filed this action January 11, 2008.

On January 14, 2008, this court granted Sapp's application for leave to proceed *in forma pauperis*, and directed the clerk of court to issue a summons and forward it to the U.S. Marshals Service for service of process. That same day, the clerk of court issued a summons as to the Archbishop, and forwarded that summons, a completed Form USM 285, a notice of case assignment, and Sapp's complaint to a U.S. Marshal for service. On February 1, 2008, Sapp filed

Page 5 - OPINION AND ORDER

an executed process receipt that had been returned to him by the U.S. Marshals Service,

indicating that service of process had been effected by U.S. Marshal Lisa Wilson on the

Archbishop, by certified mail, on January 17, 2008.

Three days later, on February 4, 2008, the Archbishop filed its motion to dismiss.

## ANALYSIS

It is well settled that, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), when

sitting in diversity federal courts apply state substantive law and federal procedural law. *See*

*Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003). Moreover, the Ninth Circuit

recently made clear that this *Erie* principle applies with equal force regardless of the court's

jurisdictional basis, holding that "the basis of a federal court's jurisdiction over a state law claim

is irrelevant for *Erie* purposes." *Sea Hawk Seafoods v. Exxon Corp.*, 484 F.3d 1098, 1100 (9th

Cir. 2007). The court specified that "[w]here state law supplies the rule of decision, it is the duty

of federal courts to ascertain and apply that law." *Id.*, *quoting Witzman v. Gross*, 148 F.3d 988,

990 (8th Cir. 1998). This court will therefore apply Oregon substantive law and federal

procedural law in deciding the Archbishop's various motions. *See id*; *see also UNR Indus. v.*

*Continental Casualty Co.*, 942 F.2d 1101, 1104 (7th Cir. 1991) (applying state law where

jurisdiction arose under 28 U.S.C. § 1334(b)).

## I.    Motion to Dismiss for Insufficient Service of Process

As noted above, federal courts lack personal jurisdiction over defendants until they have

been properly served under Federal Civil Procedure Rule 4. *See Direct Mail Specialists*, 840

F.2d at 688, *citing Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982). However, "Rule

4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice

of the complaint." *Id.* (internal quotation marks omitted), *citing United Food & Commercial Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir. 1984). Nevertheless, in the absence of substantial compliance with the provisions of Rule 4, "neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction." *Id.* (internal quotation marks omitted), *citing Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986).

Federal Civil Procedure Rule 4(h) governs service on a domestic corporation. Within a judicial district of the United States, such an entity must either be served by delivery of a copy of the summons and of the complaint to an officer or authorized agent of the corporation, or "in the manner prescribed by Rule 4(e)(1) for serving an individual." Fed. R. Civ. P. 4(h)(1). Rule 4(e)(1) provides, in turn, that service may be effected by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1).

Oregon law provides as follows:

**D(1) Notice required.  Summons shall be served**, either within or without this state, **in any manner reasonably calculated, under all the circumstances, to apprise the defendant of the existence and pendency of the action and to afford a reasonable opportunity to appear and defend**. Summons may be served in a manner specified in this rule or by any other rule or statute on the defendant or upon an agent authorized by appointment or law to accept service of summons for the defendant. **Service may be made, subject to the restrictions and requirements of this rule, by the following methods**: personal service of true copies of the summons and the complaint upon defendant or an agent of defendant authorized to receive process; substituted service by leaving true copies of the summons and the complaint at a person's dwelling house or usual place of abode; office service by leaving true copies of the summons and the complaint with a person who is apparently in charge of an office; **service by mail**; or, service by publication.

**D(2) Service methods.**

       * * *

Page 7 - OPINION AND ORDER

**D(2)(d) Service by mail.**

**D(2)(d)(i) Generally.** When required or allowed by this rule or by statute, except as otherwise permitted, **service by mail shall be made by mailing true copies of the summons and the complaint to the defendant by first class mail and by any of the following: certified, registered, or express mail with return receipt requested**. For purposes of this section, "first class mail" does not include certified, registered, or express mail, return receipt requested, or any other form of mail which may delay or hinder actual delivery of mail to the addressee.

\* \* \*

**D(3) Particular defendants.** Service may be made upon specified defendants as follows:

\* \* \*

**D(3)(b) Corporations and limited partnerships.** Upon a domestic or foreign corporation or limited partnership:

**D(3)(b)(i) Primary service method.** By personal service or office service upon a registered agent, officer, director, general partner, or managing agent of the corporation or limited partnership, or by personal service upon any clerk on duty in the office of a registered agent.

**D(3)(b)(ii) Alternatives.** If a registered agent, officer, director, general partner, or managing agent cannot be found in the county where the action is filed, true copies of the summons and the complaint may be served: by substituted service upon such registered agent, officer, director, general partner, or managing agent; or by personal service on any clerk or agent of the corporation or limited partnership who may be found in the county where the action is filed; **or by mailing true copies of the summons and the complaint to the office of the registered agent or to the last registered office of the corporation or limited partnership, if any, as shown by the records on file in the office of the Secretary of State**; or, if the corporation or limited partnership is not authorized to transact business in this state at the time of the transaction, event, or occurrence upon which the action is based occurred, to the principal office or place of business of the corporation or limited partnership, and in any

> case to any address the use of which the plaintiff knows or, on the basis of reasonable inquiry, has reason to believe is most likely to result in actual notice.

O.R.C.P. 4D (emphasis supplied).

However, in all cases where, as here, a plaintiff is proceeding *pro se* and *in forma pauperis*, it is the responsibility of the officers of the court rather than of the plaintiff to issue and to serve process and to perform all related duties. *See* 28 U.S.C. § 1915(d). It is settled law in the Ninth Circuit that:

> an incarcerated *pro se* plaintiff proceeding *in forma pauperis* is entitled to rely on the U.S. Marshal for service of the summons and complaint, and, having provided the necessary information to help effectuate service, plaintiff should not be penalized by having his or her action dismissed for failure to effect service where the U.S. Marshal or the court clerk has failed to perform the duties required of each of them. . . .

*Puett v. Blandford*, 912 F.2d 270, 275 (9th Cir. 1990). As a preliminary matter, therefore, even in the event this court found service of process insufficient in this action, the dismissal remedy requested by the Archbishop is inappropriate. Moreover, as set forth below, the record before the court suggests that the summons and complaint in this action were adequately served on the Archbishop.

The Archbishop's motion to dismiss pursuant to Federal Civil Procedure Rule 12(b)(5) is not a paradigm of clarity. The memorandum submitted in support suggests – but does not state outright – that the service of process effected by the U.S. Marshal Service was insufficient in part because only the complaint in this action, and not the summons, was served. The only evidence submitted in support of the motion, namely the declaration of Anna Smith, is simply silent as to whether the summons was present in the package the Archbishop received from the Marshals. By contrast, the presence of the summons in the court's docket and the notation that it

was forwarded by the clerk of court to the U. S. Marshals for service suggests that Marshal

Wilson was in possession of the summons at the time she served the Archbishop by certified

mail.  In the absence of affirmative evidence that Marshal Wilson omitted to include the

summons along with the complaint when she served the Archbishop, this court will not find

service defective on the grounds that it did not include a copy of the summons.

In addition, the Archbishop appears to assert that service was insufficient in that the

complaint was served by certified mail on the Archbishop rather than by personal or office

service on the Archbishop's registered agent.  The Archbishop fails to state with specificity

whether the alleged deficiency lies in the choice to serve by mail rather than by personal or

office service, or in the fact that the Archbishop, rather than its agent, was the recipient of the

mailed service, or in both.  In any event, neither alleged deficiency is so substantial as to prevent

this court from asserting personal jurisdiction over the Archbishop.

As to service on the Archbishop rather than the Archbishop's registered agent:

Despite the language of the Rule, service of process is not limited solely to
officially designated officers, managing agents, or agents appointed by law for the
receipt of process.  **The rules are to be applied in a manner that will best
effectuate their purpose of giving the defendant adequate notice.**  Thus, the
service can be made upon a representative so integrated with the organization that
he will know what to do with the papers.  **Generally, service is sufficient when
made upon an individual who stands in such a position as to render it fair,
reasonable and just to imply the authority on his part to receive service.**  . . .
Generally, the determination of whether a given individual is a 'managing or
general agent' depends on a factual analysis of that person's authority within the
organization.

*Direct Mail Specialists*, 840 F.2d at 688 (emphasis supplied; citations and internal quotation

marks omitted).  It is beyond peradventure that the Archbishop in his own person stands in

position justly and reasonably to accept service on behalf of the corporation sole, a common-law

entity created for the purpose of allowing legal continuity among the successors to a clerical or other office, of which he is the only occupier.

As to the Marshal's choice to serve the Archbishop by certified mail, it is clear that service by certified mail is among the methods of service specifically approved in Oregon Civil Procedure Rule 4D(1), and is listed in Rule 4D(3)(b) as a method approved for use with respect to corporate defendants under at least some circumstances.  *See* O.R.C.P. 4D(1), 4D(3)(b)(ii). Indeed, delivery of the summons and complaint is a method of service specifically set forth as permissible for corporate defendants in Federal Civil Procedure Rule 4(h).  Construing the rules flexibly as required by applicable jurisprudence, this court finds that the U.S. Marshal Service's standard procedure of serving defendants in actions *in forma pauperis* by certified mail is substantially compliant with the requirements of Federal Civil Procedure Rule 4.  The Archbishop is therefore within this court's personal jurisdiction.[2]

## II.    Motion to Dismiss for Failure to State a Claim

### A.    *Respondeat Superior*

The Archbishop moves to dismiss Sapp's vicarious liability claims pursuant to Federal Civil Procedure Rule 12(b)(6), on the ground that he has failed to plead facts which, if true, would establish the Archbishop's liability pursuant to the doctrine of *respondeat superior*.  To evaluate the Archbishop's argument requires analysis of Oregon's somewhat idiosyncratic *respondeat superior* jurisprudence.

---

[2]  This court's conclusion that it may properly exercise jurisdiction over the Archbishop in this action finds support in the fact that the Archbishop was apprised in timely fashion of the existence and pendency of this action and, has been afforded a reasonable opportunity to appear and defend.  Indeed, the Archbishop has suffered no conceivable prejudice from any of the alleged deficiencies in the service of process in this action.

According to Oregon law:

> Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when the employee acts within the scope of employment. Negligence or other tortious conduct by the employer is not required. . . .
>
> Three requirements must be met to conclude that an employee was acting within the scope of employment. These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).

The *Chesterman* court specified, however, that where there is a "'time-lag' between the act allegedly producing the harm and the resulting harm," it is inappropriate to analyze the applicability of the *respondeat superior* doctrine "as of the time that the injury occurred." *Id.* at 444. Under that circumstance, the court ruled, "[t]he focus should be on the *act* on which vicarious liability is based and not on when the act results in *injury*." *Id.* (emphasis original). Applying that principle, the court found that an employer could be vicariously liable for its employee's acts where the employee ingested a hallucinogenic drug allegedly for the purpose of maintaining focus at work and then later, outside the workplace and outside the scope of his employment – but still under the influence of the drug and, allegedly, in consequence of the drug's effects – entered a woman's home and sexually assaulted her. *See id.* at 443-444.

Eleven years later, in a case (like the one now before the court) involving sexual assault allegedly committed by an employee of the Archbishop, the Oregon Supreme Court had occasion to clarify the *Chesterman* ruling.

Noting that "an employee's intentional tort rarely, if ever, will have been authorized expressly by the employer," the court in *Fearing v. Bucher*, 328 Or. 367 (1999), acknowledged

Page 12 - OPINION AND ORDER

that the employee's "sexual assaults . . . clearly were outside the scope of his employment," but held that "the [vicarious liability] inquiry does not end there."  *Fearing v. Bucher*, 328 Or. 367, 374, 374 n. 4 (1999).  Instead, the court held, "[t]he Archdiocese still could be found vicariously liable, if acts that were within [the employee]'s  scope of employment *resulted in* the acts which led to injury to plaintiff."  *Id.* (citation, internal quotation marks omitted; emphasis supplied). That is, "where . . . the employer's vicarious liability arises out of the employee's commission of an intentional tort, [the court] must consider whether . . . allegations contained in the . . . complaint state ultimate facts sufficient to establish that acts that were within [the employee]'s scope of employment resulted in the acts that caused injury to plaintiff."  *Id.*

The *Fearing* court recited the material allegations of the plaintiff's complaint as follows:

> The complaint alleges that [the employee priest] used his position as youth pastor, spiritual guide, confessor, and priest to plaintiff and his family to gain their trust and confidence, and thereby to gain the permission of plaintiff's family to spend large periods of time alone with plaintiff.  By virtue of that relationship, [the employee] gained the opportunity to be alone with plaintiff, to touch him physically, and then to assault him sexually.  The complaint further alleges that those activities were committed in connection with [the employee]'s employment as youth pastor and priest, that they were committed within the time and space limitations of [the employee]'s employment, that they were committed out of a desire, at least partially and initially, to fulfill [the employee]'s employment duties as youth pastor and priest, and that they generally were of a kind and nature that was required to perform as youth pastor and priest.

*Id.*  Based on these allegations, the *Fearing* court reasoned that "a jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve [the employee]'s performance of [his] ordinary and authorized duties."  *Id.* at 375.

> Viewing the complaint in that light, the jury also could infer that, in cultivating a relationship with plaintiff and his family, [the employee], at least initially, was motivated by a desire to fulfill his . . . duties and that, over time, his motives became mixed.  We conclude that the . . . complaint contains allegations sufficient to satisfy all three *Chesterman* requirements for establishing that employee

Page 13 - OPINION AND ORDER

conduct was within the scope of employment.

*Id.*  The *Fearing* court expressly rejected the Archdiocese's argument that the allegations of the complaint amounted only to legal conclusions or mere restatements of the *Chesterman* factors themselves.  *Id.* at 375 n. 5.  The court reasoned that:

> An ultimate fact is a fact from which legal conclusions are drawn.  A conclusion of law, by contrast, is merely a judgment about a particular set of circumstances and assumes facts that may or may not have been pleaded.  . . .  Allegations of when particular conduct occurred, of the motivation behind that conduct, and of the employment-related nature of that conduct all are assertions of fact, which can be proved or disproved.

*Id.* (citations omitted).

The *Fearing* court further expressly rejected the argument that, because the alleged sexual abuse could not reasonably have furthered any interest of the employer, it could not have been within the scope of the employee's duties, reasoning that:

> in the intentional tort context, it usually is inappropriate for the court to base its decision regarding the adequacy of the complaint on whether the complaint contains allegations that the intentional tort *itself* was committed in furtherance of any interest of the employer or was of the same kind of activities that the employee was hired to perform.  Such circumstances rarely will occur and are not, in any event, necessary to vicarious liability.  Rather, the focus properly is directed at whether the complaint contains sufficient allegations of [the employee]'s conduct that was within the scope of his employment that arguably resulted in the acts that caused plaintiff's injury.

*Id.* at 375-376 (emphasis original).

The *Fearing* court specifically distinguished the facts before it from those where the circumstances of employment merely created an *opportunity* for an intentional tort to be committed, specifying that mere opportunity was not sufficient to support a finding of vicarious liability:

> Here, plaintiff alleges that [the employee] "used and manipulated his fiduciary

position, respect and authority as youth pastor and priest" to befriend plaintiff and
his family, gain their trust, spend large periods of time alone with plaintiff,
physically touch plaintiff and, ultimately, to gain the opportunity to commit the
sexual assaults upon him.  A jury reasonably could infer that [the employee]'s
performance of his pastoral duties with respect to plaintiff and his family were a
necessary precursor to the sexual abuse and that the assaults thus were a direct
outgrowth of and were engendered by conduct that was within the scope of [the
employee]'s employment.

*Id.* at 377 (citation omitted).

Finally, the *Fearing* court also affirmed the well-established proposition that "[w]hether

an employee has acted within the scope of employment at any given time generally is a question

for the trier of fact, except in cases where only one reasonable conclusion may be drawn from

the facts pled."  *Id.* at 374.

Shortly thereafter, in *Lourim v. Swensen*, 328 Or. 380 (1999), a case involving sexual

assault upon a minor Boy Scout by a Boy Scout troop leader, the Oregon Supreme Court relied

upon the same reasoning employed in *Fearing* to conclude that an extended course of

employment-related cultivation of the trust of a minor and his family could give rise to vicarious

employer liability.  The *Lourim* court recited the material facts of the plaintiff's complaint as

follows:

The following facts are alleged in the complaint.  From 1965 to 1967, [the
employee defendant] was a volunteer Boy Scout leader, duly authorized by the
Boy Scouts to act as such.  As part of his volunteer duties with the Boy Scouts, he
was directed  to fulfill the role of troop leader or assistant troop leader to
plaintiff's troop.  Plaintiff and his family became close to [the employee
defendant], and [the employee defendant] was a frequent guest in their home.
[The employee defendant] gained the trust and confidence of plaintiff's family as
a suitable friend, guide, mentor, and role model to plaintiff, then an adolescent.
By virtue of that relationship, [the employee defendant] gained the support,
acquiescence, and permission of plaintiff's family to spend substantial periods of
time alone with plaintiff.

[The employee defendant] also won the friendship and admiration of plaintiff

Page 15 - OPINION AND ORDER

himself.  He was his mentor and role model.  [The employee defendant] gained the opportunity to socialize with plaintiff and to spend time alone with him and together with other boys in remote places.  [The employee defendant] also used his position of trust to gain the opportunity to touch plaintiff physically.  Eventually, [the employee defendant] committed a series of sexual assaults on plaintiff. At the time of those assaults, plaintiff was a minor.

The complaint describes [the employee defendant]'s performance of his duties as troop leader in developing a trust relationship with plaintiff and his family, together with the eventual sexual assaults, as "manipulations."  Plaintiff alleges in the complaint that the manipulations were committed in connection with [the employee defendant] s performance of his duties as troop leader:

> "The manipulations * * * were committed within the time and space limits of his responsibilities as troop leader, were committed out of a desire, at least initially and partially, to fulfill his duties as troop leader, and were generally actions of a kind and nature which [the employee defendant] was required to perform as troop leader."

*Lourim*, 328 Or. at 384-385.  Accepting these allegations as true, and applying the principles articulated in *Fearing*, the court concluded that "a jury reasonably could infer that the sexual assaults were merely the culmination of a progressive series of actions that involved the ordinary and authorized duties of a Boy Scout leader."  *Id.* at 396.  The court further concluded that:

> a jury could infer that, in cultivating a relationship with plaintiff and his family, [the employee defendant], at least initially, was motivated by a desire to fulfill his duties as troop leader and that, over time, his motives became mixed.  A jury also reasonably could infer that [the employee defendant]'s performance of his duties as troop leader with respect to plaintiff and his family was a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee defendant]'s employment.  Finally, a jury could infer that [the employee defendant]'s contact with plaintiff was the direct result of the relationship sponsored and encouraged by the Boy Scouts, which invested [the employee defendant] with authority to decide how to supervise minor boys under his care.  Based on the foregoing, we conclude, as we did in *Fearing*, that the amended complaint contains allegations sufficient to satisfy all three *Chesterman* requirements.

*Id.* at 386-387.

Similarly, in *Bray v. American Prop. Mgmt. Corp.*, 164 Or. App. 134 (1999), the Oregon

Court of Appeals applied the *Fearing*/*Lourim* standard to find an employer vicariously liable for

its employee's actions when the employee fatally stabbed a third party in the workplace.  The

third party habitually parked a delivery van in the defendant's parking garage without

permission, and the defendant instructed its employee parking attendant to prevent the third party

from continuing to do so; the defendant neither authorized nor prohibited the use of force in

carrying out its instruction.  *See Bray*, 164 Or. App. at 136-137.  When the attendant informed

the third party that he could no longer park in the garage, a scuffle ensued which culminated in

the attendant killing the third party with a knife.  *See id.* at 137.  The court concluded that:

> as in *Fearing* and *Lourim*, the jury could find that **the stabbing was merely the culmination of a progressive series of actions that involved [the attendant's] ordinary and authorized duties**.  That is, reasonable jurors could find that the stabbing was the product of the escalating antagonism between [the attendant] and [the third party] centering on [the third party]'s obstruction of access to the parking garage and use of that garage. . . .  Moreover, reasonable jurors could find that **[the employer]'s directive to [the attendant] not to permit [the third party] to park in the garage was a necessary precursor to the stabbing and that the stabbing was a direct outgrowth and was engendered by conduct that was within the scope of [the attendant's] employment**," *viz.*, [the attendant]'s telling [the third party] that he could not park in the garage.

*Bray*, 164 Or. App. at 140-141 (emphasis supplied; citations, internal quotation marks, and

modifications omitted).  The court expressly observed that, under "*Fearing* and *Lourim*, direct

causation, not 'reasonable foreseeability' . . . , is the *sine qua non* of *respondeat superior*

liability."  *Id.* at 141.

Three years later, in *Minnis v. Oregon Mutual Ins. Co.*, 334 Or. 191 (2002), the Oregon

Supreme Court found that no vicarious liability attached in connection with a managerial

employee's sexual assault of an employee under his supervision.  The managerial employee

allegedly both sexually harassed the supervised employee in the workplace and sexually

assaulted her outside the workplace, specifically in his own apartment.  *See Minnis*, 334 Or. at

197.  The *Minnis* court held that because the *Minnis* plaintiff had testified that the workplace

conduct and the sexual assault were "episodes in a series," rather than that the sexual harassment

"*resulted in* or *caused*" the sexual assault, "the *Chesterman* 'time-lag' standard" was inapplicable,

and the *respondeat superior* test was to be applied solely to the conduct taking place at the

managerial employee's apartment.  *Id.* at 202 (emphasis original), 203.  Because this conduct was

not within the manager's employment duties, the court found that the employer was not

vicariously liable under *Chesterman*.  *See id.* at 203-204.  The *Minnis* court expressly

distinguished *Fearing* and *Lourim* on the ground that the tortfeasor's workplace conduct had not

been alleged to be a necessary precursor or otherwise a cause of the subsequent sexual assault.

*See id.* at 204-206.

 The Oregon Court of Appeals recently applied the *Fearing*/*Lourim* standard once again

to allegations of sexual assault by priest employees of the Archbishop.  In *Schmidt v.*

*Archdiocese of Portland*, 2008 Or. App. LEXIS 336 (2008), Father F., one of two priests alleged

to have molested the plaintiff during his minority, was present when the plaintiff, then aged

seven or eight, fell while rollerskating and skinned his knees.  *Schmidt*, 2008 Or. App. LEXIS at

*3.  Fr. F. helped the boy to his feet, took him into a church basement on the pretext of

examining his scraped knees, and there sodomized him.  *See id.* at *3-4.  The plaintiff had never

met his abuser before the incident occurred.  *See id.* at *7, *61.

 In analyzing whether the priest's employers could be found vicariously liable for their

agent's sexual assault, the *Schmidt* court found, first, that the record contained no evidence that

Fr. F. had, as had the priest in *Fearing*, cultivated a relationship of trust with his victim before

assaulting him.  *See id.* at *60-61.  Next, "[a]s an alternative to cultivation of a trust relationship

as a basis for imposing vicarious liability," *id.* at *61, the court analyzed the priest's conduct

immediately preceding the assault to determine whether the record contained "evidence of

conduct by [Fr. F.] that was motivated, at least in part, by a purpose to serve [his employer]; that

was of a kind that [Fr. F.] was hired to perform; and that resulted in the acts causing plaintiff's

injury," *id.* at *60.  The court found in that regard that the record contained no evidence from

which a jury could conclude either that the priest had been motivated to serve his employer by

picking up the fallen child and taking him into a church basement or that helping fallen children

was among his authorized employment duties.  *See id.* at *62-65.  The court expressly found

evidence that Roman Catholic priests were expected to care for their parishioners insufficient to

establish a particular employment duty to do so.  *See id.* at *64 ("[a]bstract doctrine regarding

the status of priests within the Catholic Church sheds no light on the question whether the

particular actions at issue here were employment duties imposed on [this priest], in his capacity

as a parish priest of St. Mary's Church, by the archdiocese").  Similarly, the court expressly

found "evidence relating to the respect and obedience that parishioners are trained to show to

priests" – including plaintiff's own affidavit that he believed from Catholic teaching that he had

no choice but to obey a priest's commands – irrelevant to the question whether Fr. Frank was

carrying out authorized employment duties when he took the boy into the church basement.  *Id.*

Based on these findings, the court affirmed summary judgment in favor of the employer

defendants.  *See id.* at *65.

      Here, Sapp argues – but does not allege in his complaint – that it was among Fr. T. L.'s

employment duties to manage parish property and see to its upkeep, including making

arrangements for the grass to be cut.  Sapp's position appears to be that when Father T. L. hired

or offered to hire Sapp to cut grass at All Saints, he was acting within the scope of his

employment duties and was motivated at least in part to serve his employer.  For purposes of

analysis, this court will assume *arguendo* that if given the opportunity, Sapp would amend his

complaint to allege that Father T. L. was responsible for groundskeeping at All Saints or was

required by the terms of his employment to render financial assistance to indigent children, and

that he was motivated at least in part to carry out one or both of those duties when he invited

Sapp into his car in August 1979.

Even on the assumption that Fr. T. L.'s initial motivation in inviting Sapp into his car was

partly employment-related rather than criminally prurient in its entirety, Sapp offers no

allegation or argument that could support the conclusion that the priest's employment-related

conduct *resulted in* (as opposed to merely creating an opportunity for) the acts that caused Sapp's

injury.  Under Oregon's *respondeat superior* jurisprudence, creation of opportunity within the

scope of employment is insufficient to support a finding of vicarious liability under Oregon law.

*See Feearing*, 329 Or. at 377.  The Archbishop can be vicariously liable for Fr. T. L.'s tortious

conduct only if actions taken by the priest within the scope of his employment duties were in

some sense a "necessary precursor" to the abuse he later committed, that the abuse Sapp suffered

was a "culmination of a progressive series of actions that began with and continued to involve

[Fr. T. L.]'s performance of [his] ordinary and authorized duties" or otherwise was a "direct

outgrowth of" or "engendered by" the priest's employment-related conduct.  *Id.* at 377, 375.  This

requirement cannot be satisfied by reference either to Fr. T. L.'s status as a priest or ranking

member of the Roman Catholic religious hierarchy or to any habit of obedience to priests that

Sapp may have acquired as a result of his upbringing:  as in *Fearing*, *Lourim*, and *Bray*, for *respondeat superior* to apply to an employee's tort, the tortious action must have been the product of actions taken by the tortfeasor within the scope of his employment, not of the tort victim's subjective beliefs predating his encounter with the tortfeasor.

Here, Fr. T. L. neither took affirmative steps to cultivate a relationship of trust with Sapp nor took any other action within the scope of his employment duties that constituted a necessary first step of, or otherwise engendered, the abuse to which Sapp was later subjected.  At most, Fr. T. L.'s status as a priest served to create an opportunity for a sexual predator to prey upon his victim, which is insufficient as a matter of law for vicarious liability to attach to Fr. T.L.'s employer.  The Archbishop's motion to dismiss is therefore granted as to Sapp's *respondeat superior* claims.

### B.    Negligence

Unlike his vicarious liability claims, Sapp's negligence claim alleges the Archbishop's direct liability.  Specifically, Sapp appears to allege that the Archbishop negligently caused him to suffer harm by hiring Fr. T. L. without adequate psychological testing and/or failing to supervise him adequately and/or failing to terminate his employment at a time when the Archbishop knew or should have known of Fr. T. L.'s predatory predilections.

Because the abuse took place in 1979, 29 years before Sapp filed this action, and because the limitations period applicable to actions for negligence is two years, Sapp relies upon a statutory exception to the applicable statute of limitations in bringing this direct liability claim. O.R.S. 12.117 provides in part as follows:

> Notwithstanding ORS 12.110 [(the two-year limitations period generally
> applicable to tort claims, including those for negligence) or] 12.115 [(the ten-year

statute of ultimate repose specifically applicable to negligence claims)]. . . , an action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse accruing while the person who is entitled to bring the action . . . has not discovered the injury or the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the injury or the causal connection between the injury and the child abuse, not more than three years from the date the injured person discovers or in the exercise of reasonable care should have discovered the injury or the causal connection between the child abuse and the injury, whichever period is longer.

O.R.S. 12.117(1).  For purposes of Section 117, the term "child abuse" is defined as:

(a) Intentional conduct by an adult that results in:

(A) Any physical injury to a child; or

(B) Any mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child;

(b) Rape of a child, which includes but is not limited to rape, sodomy, unlawful sexual penetration and incest, as those acts are defined in ORS chapter 163;

(c) Sexual abuse, as defined in ORS chapter 163, when the victim is a child; or

(d) Sexual exploitation of a child, including but not limited to:

(A) Conduct constituting violation of ORS 163.435 and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact; and

(B) Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167.

O.R.S. 12.117(2).  The Oregon Court of Appeals has expressly held that Section 117 may

properly be applied to torts of negligence, stating that "the statute clearly does apply to

negligence claims, but only [to] those involving 'knowingly allowing, permitting or encouraging

child abuse.'"  *Lourim v. Swensen* [("*Lourim I*")], 147 Or. App. 425, 439 (1997).  The *Lourim I*

Page 22 - OPINION AND ORDER

court further specified that actual as opposed to constructive knowledge was required for the extended limitations period to apply. *Id.* at 444.

Here, Sapp alleges, at most, that the Archbishop knew (or should have known) of Fr. T. L.'s *predilection* for sexual abuse of minors, not that the Archbishop had actual knowledge that Fr. T. L. was subjecting Sapp in particular to sexual abuse at the time the abuse took place in 1979. Therefore, although Fr. T. L.'s conduct clearly constituted child abuse as that term is defined in Section 117(2), Sapp has not alleged that the Archbishop "*knowingly* allow[ed], permitt[ed] or encourag[ed]" that particular conduct. O.R.S. 12.117(1) (emphasis supplied). Section 117 is therefore inapplicable to Sapp's negligence claim as currently pled. The Archbishop's motion to dismiss is therefore granted as to Sapp's claim for negligence.

## CONCLUSION

For the reasons set forth above, the Archbishop's motion to dismiss (#7) is denied to the extent premised on insufficient service of process, and granted to the extent premised on failure to state a claim. However, because this case was brought by a plaintiff proceeding *pro se*, plaintiff Sapp will be afforded a period of sixty days within which he may file an amended complaint to cure the deficiencies identified above. In the event that no amended complaint is

/ / /

filed on or before the close of sixty days following the date hereof, final judgment will be

entered.

Dated this 22nd day of April, 2008.

  /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 24 - OPINION AND ORDER